UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
In re:

                                   Case No. 8-10-73295-reg

THE BROWN PUBLISHING COMPANY,        (jointly administered)
DPI LIQUIDIATION INC., BROWN MEDIA
HOLDINGS COMPANY, BOULDER
BUSINESS INFORMATION, INC., LLC,
BUSINESS PUBLICATIONS, LLC,
THE DELAWARE GAZETTE COMPANY,
SC BIZ NEWS, LLC, TEXAS
 COMMUNITY NEWSPAPERS, INC.,
TEXAS BUSINESS NEWS, LLC, TROY
DAILY NEWS, INC., UPSTATE
 BUSINESS NEWS, LLC, UTAH
BUSINESS PUBLISHERS, LLC,
ARG, LLC,

                          Debtors..           Chapter 11
-------------------------------------------------------------------x
THE BROWN PUBLISHING COMPANY
LIQUIDATING TRUST, LLC,

                      Plaintiff,

                                    Adv. Proc. No. 8-12-08173-reg

   v.

HUDSON PRINTING CO,

                      Defendant.
-------------------------------------------------------------------x

## DECISION AFTER TRIAL

      Before the Court is an adversary proceeding commenced by the Brown Publishing

Company Liquidating Trust ("Trust") seeking to avoid and recover transfers from the Brown

Publishing Company ("Brown") to defendant Hudson Printing Company ("Defendant" or

"Hudson") pursuant to 11 U.S.C. §§ 547, 548, 549, 550, 502, and "general principles of setoff

and recoupment." The Trust, which was granted the authority to commence this action on behalf

of the jointly-administered estates under the Debtors' confirmed plan, alleges that Brown made

three transfers totaling $66,176.80 ("Transfers") to Defendant for the benefit of Utah Business Publishers, LLC ("Utah"), a subsidiary of Brown and a Chapter 11 debtor. The Trust alleges the Transfers are avoidable as statutory preferences, constructively fraudulent conveyances and/or post-petition transfers. The Trust further alleges that if the Transfers are avoided under any of these theories, the Transfers are recoverable from Defendant pursuant to §550, and that Defendant's proofs of claim filed in the Utah bankruptcy for sums remaining due and owing by Utah must be disallowed pursuant to §502 and under general principles of set-off and recoupment.

The Trust devoted scant attention to the preference cause of action at trial, merely alleging in conclusory terms that the Transfers were avoidable as preferences. While the Transfers may fit within the definition of a preference set forth in § 547(b), the Defendant successfully established two statutory defenses to defeat the preference claim; first, that the Transfers were for debts incurred in the ordinary course of business and paid in the ordinary course of business between the relevant parties pursuant to section 547(c)(2), and second, that the Defendant provided unsecured new value subsequent to the Transfers that remains unpaid pursuant to section 547(c)(1). The Trust acknowledged at trial that the Transfers were made in the ordinary course of business, as it was customary for Brown to sweep Utah's account on a daily basis, and for Brown to pay all of Utah's debts, including the debts owed to Hudson. In addition, based on the proofs of claims filed by Hudson, Hudson provided services to Utah after the Transfers which remain due and owing, and which exceed the amount of the Transfers. As for the theory that the Transfers are recoverable under § 549, there is simply no evidence to support the Trust's allegation in the complaint that the Transfers occurred post-petition.

The constructive fraudulent conveyance claim under section 548(a)(1)(B) requires an examination of the circumstances under which payments made by a parent to satisfy obligations of its subsidiary are recoverable for the benefit of the parent's bankruptcy estate.  This analysis turns on the extent to which the parent receives a benefit, and whether this benefit constitutes reasonably equivalent value to the parent.  In this case, the Trust failed to establish that Brown received less than reasonably equivalent value in exchange for the Transfers.   The Trust asserts that Brown itself received little to no value for the Transfers because the Transfers paid an obligation incurred by Utah.  The Trust also claims that Brown and Utah are two legally distinct entities, and at best, all that Brown received in exchange for the Transfers was an intercompany credit that was worthless, because both Brown and Utah were hopelessly insolvent.

While the insolvency of Brown is a necessary element of this cause of action, satisfying this element does not resolve whether Brown received reasonably equivalent value for the Transfers. By focusing on the alleged insolvency of Brown and the large intercompany debt owed by Utah to Brown, the Trust misses the point that Brown received tangible and intangible indirect benefits from the Transfers.   Despite the fact that Brown and Utah were separate legal entities, Brown and Utah operated as a single economic unit.  Brown retained all of the income generated by Utah and paid all of Utah's obligations.  Each time the cash was swept out of Utah's bank account and into Brown's account, which happened on a regular basis, Brown received a measurable benefit.  Brown used the funds generated by Utah's operations to pay down Brown's working capital line and expand its borrowing base. In addition to these benefits, Brown reaped the benefit of Utah's increasing value.  By paying Hudson, Brown ensured that Utah's publications would be printed on time and without interruption, preserving Utah's goodwill and reputation, and increasing the amount Brown ultimately received upon the sale of

Utah during the bankruptcy proceeding. Permitting the Trust to recover the Transfers while Brown retains all of the benefits generated by Utah is not consistent with the purpose or intent of § 548(a)(1)(B), which is to preserve the estate for creditors, but not at the expense of creditors who provide fair consideration in exchange for a transfer. *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir. 1981)("[I]f the debtor receives property…that is substantially equivalent in value to the property given or obligation incurred by him in exchange, then the transaction has not significantly affected his estate and his creditors have no cause to complain.").

Because the Trust has failed to establish that the Transfers are subject to avoidance as set forth in the complaint, the Transfers cannot be recovered from the Defendant pursuant to §550. The Defendant's claims are also not subject to disallowance under §502 or general principles of set-off and recoupment.

## Jurisdiction

This adversary proceeding is a core proceeding and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157(b) and 1334(b). The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

## Procedural History

Brown, along with affiliate Brown Media Holdings Company and their subsidiaries, filed for Chapter 11 relief on April 29 and 30, 2010. Hudson filed proofs of claim against Utah for $66,731.75 on June 1, 2010 and for $66,686.75 on October 8, 2010.[1] The Trust filed the Complaint in this adversary proceeding on April 28, 2012. Hudson filed an Answer on June 19, 2012. The Trust moved for Summary Judgment on its fraudulent conveyance claim on August 20, 2013. Defendant filed Opposition and a Cross Motion for Summary Judgment to dismiss all

---

[1] These are duplicate proofs of claim.

of the claims on September 9, 2013. The Trust replied on September 25, 2013. The Trust filed an

Order to Show Cause ("OSC") on September 17, 2013 to exclude Defendant's expert report and

testimony. Defendant opposed the OSC on September 24, 2013, and the Trust replied on

September 30, 2013. The Court heard arguments on the summary judgment motions and OSC on

October 2, 2013, and denied all three motions. A trial was conducted on October 8, 2013. The

Court admitted the Trust's Exhibits 1-4, Defendants Exhibits A, B, C, I, J, O, and the Deposition

of B. Joseph Ellingham ("Ellingham") without objection. The Defendant objected to Plaintiff's

Exhibit 5 on the grounds of hearsay. *Trial Transcript ("Tr.") 114:5.* The Court overruled this

objection. The Court admitted Defendant's Exhibit L, Deposition of Tyler Dabo ("Dabo"),

Exhibit M, Deposition of Roy Brown ("Brown"), and Exhibit R, Deposition of John Curtis

("Curtis") with the proviso that the Trust could make written evidentiary objections to their

content. These objections were submitted on September 26, 2013 and October 16, 2013 and

responded to by the Defendant on October 14, 2013.[2]  Plaintiff objected to Defendant's Exhibit

K on the grounds of authentication.  The Court agrees that it was not authenticated, and did not

consider this Exhibit. Both parties submitted post-trial briefs. Thereafter, the matter was marked

submitted.

### Facts

Brown Publishing Company was a media holding company operating through

subsidiaries which produced a variety of print and internet publications. In the fall of 2007, it

entered into a loan agreement with PNC Bank for the financing of its new acquisitions and for

the restructuring of existing debt. *Brown 65:20-22*. PNC required Brown to utilize an integrated

cash management system to receive cash and revenue from its subsidiaries and pay expenses so

---

[2] To the extent the Court relies upon testimony to which the Trust objected, it will rule within the text of
the opinion.

that it could control the companies' cash. *Tr. 14:1-2.* Under this integrated system, cash and revenues generated by the Debtor's subsidiaries would be deposited into a local account. PNC Bank would then "sweep" these accounts on a daily or near-daily basis, withdrawing all but $500 (the minimum deposit required for most accounts) and depositing the funds into a central corporate account. *Tr. 15:17-24, Ellingham 12:12-15.* The funds from each subsidiary were commingled and used to pay the subsidiaries' expenses, Brown's expenses, and to pay down Brown's revolving credit facility, which expanded Brown's borrowing base. *Tr. 14:2-6, 18:1-2, 21:8-10, 57:14-1, 63:1-5, Ellingham 12:5-11, Brown 13:1-21.* The borrowing base for the revolving credit facility was calculated based on a percentage of "receivables of inventory and other collateral." *Tr. 68:8-11.*

Brown purchased Utah in 2008. Utah produces 15 print publications annually: 12 monthly editions of Utah Business Monthly, and annual editions of Sandy Style, the Utah Book of Lists, and Business in Utah. *Dabo 15:15-16:12.* Its print publications make up approximately 80% of its business. *Dabo 16:19-17:2.* Utah Business Monthly has never missed a month of publication. *Dabo 58:10-13.*

Hudson was Utah's printer. *Dabo 32:6-10.* Hudson also distributed the publications by delivering them to a mailing house. *Dabo 33:20-34:4.* Before Hudson printed a job, it had to approve the job for "creditworthiness," which required that "payment for the previous job had been received." *Tr. 136:1-8*

To keep track of the funds collected from Utah's account and expended on behalf of Utah, Brown utilized an intercompany account. The intercompany account balance reflected the price Brown paid to purchase the subsidiary "less the net of transactions from purchase price to this point in time." *Ellingham 26:23-25.* As of March 1, 2009, Utah's intercompany balance was

$3,649,783.22. *Exh. I.* As of April 4, 2010, Utah's intercompany balance was approximately $3,382,000. *Tr. 32:4-10, discussing Exh. 3.* By the time Utah filed for bankruptcy relief, the intercompany balance had decreased further to $3,290,882. *Ellingham 20:6-21:10* (discussing Utah's Schedule F). Thus, the "net of transactions" between March 1, 2009 and the petition date resulted in positive cash flow to Brown in the amount of $358,901.22.

The Transfers were made by Brown to Hudson on behalf of services Hudson rendered to Utah during the 90 day prepetition period. The first payment was made on February 2, 2010 for $19,556.81 (Utah Business December 2009). *Tr. 8:5-7, John Curtis 57:21-58:21.* The second payment was on March 5, 2010 for $24,611.98 (Utah Business Book of Lists 2009). *Tr. 8:9-14, Curtis 57:21-58:21.* The third payment was on March 26, 2010 for $22,008.01 (Utah Business January 2010). *Id.* These print issues were particularly important because a new competitor was challenging Utah's position in the marketplace. *Dabo 46:24-47:12.*[3] Each payment was consistent with prior payments the Debtor made to Hudson for similar services.

Although Brown was operationally profitable, it could not service its debt and defaulted under the loan agreements. *Brown 61:8-13.* As of March 31, 2010, the consolidated Brown entities had assets valued at $94,047,979.91 and liabilities of $104,621,770.80. (Decl. Roy Brown, Exh. C to Ellingham, at ¶39). At the time of filing, Brown itself had negative $21,379,235.88 shareholder equity (Brown Balance Sheet, Ex. E to Decl. Roy Brown). The Defendant does not dispute that Brown was insolvent during the 90 day period prior to the petition date.

---

[3] The Trust objected to this testimony on the grounds that it is irrelevant and calls for a legal conclusion. This is not a legal conclusion and is relevant to whether Utah's value as a going concern would decrease if an issue was not printed on time. This objection is overruled.

Brown and all of its subsidiaries filed petitions for relief under Chapter 11 on April 29 and 30, 2010. Brown characterized Hudson as a critical vendor in the bankruptcy proceedings. *Id*. at 62-63. As part of the bankruptcy proceedings, Brown's assets were sold for about $27.5 million, which was substantially less than the approximately $100 million due on the first and second lien credit agreements. *Tr. 35:14-23*. Media One bought Utah for about $450,000.00. *Dabo 10:19-22,*[4]*Brown 32:13-25.*[5] The ultimate sales price Brown received was for a "cash flow stream" based on a multiple of revenues or EBITDA. *Tr. 111:6-10, 118:14*. The greater the cash flow generated by the subsidiaries, the greater the price. *Tr. 118:22-119:2, Dabo 51:23-52:7.*[6]

### Discussion

### 11 U.S.C. §547

The Trust seeks to recover the Transfers pursuant to 11 U.S.C. §547, which states that:

**(b)** Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
  **(1)** to or for the benefit of a creditor;
  **(2)** for or on account of an antecedent debt owed by the debtor before such transfer was made;
  **(3)** made while the debtor was insolvent;
  **(4)** made--
    **(A)** on or within 90 days before the date of the filing of the petition; or
    **(B)** between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
  **(5)** that enables such creditor to receive more than such creditor would receive if—
    **(A)** the case were a case under chapter 7 of this title;

---

[4] The Trust objected to this portion of Dabo's testimony as speculation and irrelevant. This objection is overruled. Purchase price is relevant to Utah's value as a going concern and the testimony is not speculation because Dabo testified that he actively participated in the sale and "went back and forth with Media One." Dabo 11:6-23. Dabo testified from personal knowledge of the negotiations.

[5] The Trust objected to this portion of Brown's testimony on the grounds that it called for a legal conclusion. The objection is overruled. Whether a business is "profitable" is not a legal conclusion. Fed. R. Evid. 704(a).

[6] The Trust objects to this testimony on the grounds that it is speculation and calls for a legal conclusion. As discussed *infra*, this is not a legal conclusion. Nor is this speculation; Dabo had sufficient personal knowledge to testify regarding the impact missing an issue or publication would have had on revenues and EBITDA. This objection is overruled.

> **(B)** the transfer had not been made; and
> **(C)** such creditor received payment of such debt to the extent provided by the provisions of this title.

**(c)** The trustee may not avoid under this section a transfer--

**...**

> > **(2)** to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--
> > > **(A)** made in the ordinary course of business or financial affairs of the debtor and the transferee; or
> > > **(B)** made according to ordinary business terms
> > > **...**
> > **(4)** to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor--
> > > **(A)** not secured by an otherwise unavoidable security interest; and
> > > **(B)** on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

While the Trust bears the burden of establishing that a transfer is avoidable under §547(b), the Defendant bears burden of establishing that a transfer falls within one of the exceptions contained in §547(c). *In re Roblin Indus., Inc.*, 78 F.3d 30, 43 (2d Cir. 1996). The parties dispute whether this debt was "owed" by Brown, pursuant to §547(b)(2). *Tr. 128:10-129:19.* However, assuming *arguendo* that the Transfers fall within §547(b), the Defendant has adequately established both the "ordinary course of business" defense contained in §547(c)(2) and the "subsequent new value" defense contained in §574(c)(4).

The ordinary course of business defense requires the Defendant to show that the debt was incurred by Brown in the ordinary course of business and that Brown made payments to Hudson either in the ordinary course of business or according to ordinary business terms. The evidence adduced at trial supports the Defendant's argument that the Transfers were made in the ordinary course of business between the parties. In the ordinary course of business, Utah would place an order with Hudson, Hudson would then print and deliver the order, and Hudson would invoice Utah. *Dabo 34:18-36:3.* Hudson was Utah's only printer during the relevant time, and this

course of conduct was "within the bounds of [Utah's] relationship with Hudson for 25 years." *Dabo 37:19-20,*[7] *58:14-17.* The Call Summary, (Exhibit A), Invoices (Exhibit C), and Accounts Receivable Summary (Exhibit B) submitted by Defendant demonstrate that the debts associated with the Transfers were incurred in accordance with these terms. See also *Curtis 57:21-58:21.* At trial, the Trust even stipulated that the payments were made in the ordinary course of business. *Tr. 131:4-9, 133:5-8, 134:21-22.* Thus, Utah has established that Brown incurred and paid these debts in the ordinary course of its business, which satisfies §547(c)(2)(A).

The record also supports the Defendant's argument regarding the "subsequent new value" defense to a preference action. Hudson filed a claim in Bankruptcy Court for at least $66,868.75 for services rendered after the Transfers, for the ultimate benefit of the Debtor, and for which Hudson was not paid. *Tr. 136:9-25, 137:10-25, Exhibit A.* Specifically, the unpaid invoices 57249.01, 57250.01, 57390.01,  9685, 57570.01, and 57415.01 reflect value provided by Hudson to Utah, which generated cash in Utah's account, and which cash was swept into the Debtor's account.  These invoices represent unsecured subsequent new value provided by Hudson that exceeds the value of the Transfers and remains unpaid.  *Curtis, 60:2-23. Exhibit B.* Because Defendant established the requirements of §547(c)(2) and (4), the Trust may not avoid the Transfers  as preferences.

**11. U.S.C. §548**

The Trust also seeks to avoid the Transfers as constructively fraudulent conveyances pursuant to §548(a)(1)(B). 11 U.S.C. §548 provides:

---

[7] The Trust objected to this testimony as calling for a legal conclusion and irrelevant. As discussed above, legal conclusions "tell the jury what result to reach." This is not a legal conclusion. This is relevant to whether the payments were in the ordinary course of business, which is a defense against a preference action. Regardless, the Trust stipulated to the fact that the payments were made in the ordinary course of business. The objection is overruled.

**(a)(1)** The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily-
…
**(B)(i)** received less than a reasonably equivalent value in exchange for such transfer or obligation; and
**(ii)(I)** was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

The Trust submitted a single piece of evidence within a voluminous record to establish that Brown was insolvent on March 31, 2010, but never identified or adduced testimony regarding this evidence at trial. Instead, the Trust relied on the asset sale price of $27 million, which occurred six months later, as proof of insolvency. While an entity is presumed insolvent in the 90 days prepetition for purposes of preference claims, it is not presumed insolvent in the 90 days prepetition for purposes of avoiding constructively fraudulent conveyances. *In re Jesup & Lamont, Inc.*, 10-14133 (ALG), 2014 WL 1245003 at *14 (Bankr. S.D.N.Y. Mar. 26, 2014)( "There is no  presumption of insolvency in a fraudulent conveyance action as there is in the preference statute…If a trustee shows that the debtor was insolvent at a time subsequent to the date of the alleged fraudulent transfer, the trustee must also show that the debtors' financial condition did not change during the interim period."). Regardless, assuming that insolvency as of March 31, 2010, satisfies (b)(i) for Transfers on February 2, March 5, and March 26, 2010, the Trust failed to establish that Brown received less than reasonably equivalent value for the Transfers within (b)(ii).

 Three-sided transactions present special difficulties. If a debtor made a payment for services or goods received only by a third party, the debtor usually will not have received reasonably equivalent value. *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir. 1981) ("transfers solely for the benefit of third parties do not furnish fair consideration")

(internal quotations omitted). However, reasonably equivalent value can be found if there is a direct or an indirect benefit to the transferor. *Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir. 1979)("Benefit to a debtor need not be direct; it may come indirectly through benefit to a third person."); *In re Akanmu*, 502 B.R. 124, 131 (Bankr. E.D.N.Y. 2013). "The most straightforward indirect benefit" occurs when the debtor receives from the third party "some of the consideration paid to it." *In re Image Worldwide, Ltd.,* 139 F.3d 574, 578 (7th Cir. 1998); *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir. 1981) (benefit accrues to the debtor "[i]f the consideration given to the third person has ultimately landed in the debtor's hands."). Indirect benefits also include goodwill, *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991), increased ability to borrow capital, *Id.*, and safeguarding an important source of supply. *Telefest, Inc. v. VU-TV, Inc.*, 591 F. Supp. 1368, 1380-81 (D.N.J. 1984).

Thus, most transfers made by parents to or on behalf of subsidiaries result in at least some benefit to the parent because the subsidiary is an asset of a parent, so preserving the subsidiary generally impacts the parent's net worth. However, in some instances, "[c]ourts have found a parent's transfer of assets to a subsidiary to be for less than reasonably equivalent value when the subsidiary was insolvent at the time of transfer." *In re Worldcom, Inc., 02-13533(AJG),* 2003 WL 23861928 at *41 (Bankr. S.D.N.Y. Oct. 31, 2003), citing *In re Duque Rodriguez,* 77 B.R. 939, 941–42 (Bankr.S.D.Fla.1987), *aff'd, In re Rodriguez,* 895 F.2d 725 (11th Cir.1990); *In re Chase & Sanborn Corp.,* 68 B.R. 530 (Bankr.S.D.Fla.1986), *aff'd,* 848 F.2d 1196 (11th Cir.1988). In these cases, the parent received no benefit other than an increased equity interest in the subsidiary, *Chase*, 68 B.R. at 533, and that increased equity interest was worthless under the facts of those cases. *Rodriguez*, 895 F.2d at 727. In *Duque Rodriguez*, a parent company made

payments on a chattel mortgage for a Lear jet owned by a subsidiary which did not use the jet and provided the jet's services for free to other affiliated companies. The subsidiary was insolvent and the jet was subsequently repossessed while the subsidiary still owed significantly more than the value of the jet. Because the jet did not enhance or preserve the subsidiary's value and had already been repossessed outside bankruptcy, the payments on the note provided no benefit to the parent's bankruptcy estate and were set aside as constructive fraudulent conveyances. As the Eleventh Circuit held, if the parent's payments "were equated in this with an equivalent increase in [the parent's] net worth, [the Court] would find that [the parent] received an indirect benefit from a three-sided transaction which was reasonably equivalent value for the transfers.  Obviously, however, it did not." *Id.*

Even if the Court finds that a benefit accrued to Brown, it must also measure that benefit to ensure that the Brown received reasonably equivalent value for the Transfers. The Court of Appeals for the Second Circuit in *Rubin* explained:

> Accordingly, the Court must attempt to measure the economic benefit, if any, that accrued to each bankrupt as a result of the third person's indebtedness, and it must then determine whether that benefit was "disproportionately small" when compared to the size of the security that that bankrupt gave and the obligations that it incurred.

*Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d at 993.

In this case, the Court must first decide whether Brown received a direct or indirect benefit from the Transfers to Hudson. Then, the Court must compare the benefit Brown received with the amount of the Transfers to determine if the benefit was "disproportionately small."

### Analysis

The Trust alleges Brown received no benefit in exchange for the Transfers because, according to Utah's Statement of Financial Affairs ("SOFA"), Utah operated at a loss. (Trust Post-Trial Brief at 5). The Trust also minimizes the significance of Brown's practice of sweeping

all of Utah's cash, objecting to the admissibility of testimony relating to the cash and other benefits as irrelevant,[8] because Utah was hopelessly insolvent.[9] *Id*. The Trust's expert "didn't think it was necessary to make valuations," *Tr. 121:9-13*, and did not "see a reason" to consider the economic impact of the cash Brown received from Utah in determining whether Brown received reasonably equivalent value, *Tr. 122:3-21*. In contrast, Defendant identifies the cash and revenue sweeps and Brown's ability to expand its borrowing base[10] as tangible indirect benefits received by Brown. Defendant identifies the preservation of Utah, an asset of Brown, as a going concern as an intangible indirect benefit received by Brown.

The Trust fails to give proper weight to these benefits because it conflates the elements of insolvency and reasonably equivalent value. Insolvency relates to whether enhancing a parent's equity interest in a subsidiary has any value, but it does not preclude the parent from receiving benefits other than an enhanced equity interest. Insolvency only matters for transfers by a parent to or on behalf of a subsidiary for which the parent receives nothing other than an enhanced equity interest. Here, Brown received another benefit-cash-when it swept the accounts generated by the magazines Hudson printed from Utah. Brown used the cash to pay Brown's expenses, pay Brown's other subsidiaries' expenses, pay down Brown's credit facility, and expand Brown's borrowing base. Moreover, unlike the unused airplane in *Rodriguez*, preserving and enhancing

---

[8] For instance, the Trust took the view that the Utah's ultimate sales price of $450,000 to Media One, the revenues derived from the magazines printed by Hudson was irrelevant, the damage to Utah's reputation that would have occurred if Hudson did not print the magazines, the presence of a new competitor in the marketplace, the testimony that Utah's revenue and EBITDA would have decreased if Hudson did not print the subject magazines, the testimony that Utah was a "driver" of Brown's business, and the testimony the fact that Utah Business Magazine was generally "profitable" were all irrelevant. Dkt #41.

[9] The Trust also argued that Brown did not have to pay for the services because they had already been provided. The argument that the services occurred prior to the payment, and that therefore there is no reasonably equivalent value, appears for the first time in the Trust's Post-Trial Brief. *(LT Post-Trial Brief at 2)*. The Trust does not and could not provide any basis for the idea that services provided before payment automatically lack reasonably equivalent value because a company can just "keep its cash." *Id.*

[10] Although Brown was in default of its credit agreements by the time its bankruptcy petition was filed, and thus could not expand its borrowing base, there was no evidence on the record that Brown was in default at the time of the Transfers.

Utah's equity provided a benefit to Brown. The purchase price Media One paid Brown for Utah was a function of Utah's receivables and goodwill, both of which would have been much less if Hudson stopped publishing Utah's magazines.

The value Brown received as a result of the Transfers is not disproportionately small to the amount Brown expended. Brown swept at least $155,003 in local advertising revenue in December 2009 alone from Utah as a result of publications printed by Hudson. *Dabo 69:1-24*. Hudson was Utah's lifeblood, *Tr. 41:23-24,* and a substantial portion of the receivables can be attributed to Hudson's services. Even if the magazines had generated less cash, each Transfer ensured that particular magazine issues would be printed on time and without interruption. Given the competitive environment in which Utah operated, failing to publish any of these magazines would have severely damaged Utah's reputation. The goodwill from printing Utah Business December 2009 is not disproportionately smaller than $19,556.81, the goodwill from printing Utah Business Book of Lists 2009 is not disproportionately smaller than $24,611.98, and the goodwill from printing Utah Business January 2010 is not disproportionately smaller than $22,008.01.

The Trust is trying to recover transfers to Utah's most important vendor for services that resulted in its most profitable publications. Its theory that Brown and Utah's alleged insolvency somehow renders these services not valuable is woefully misplaced. Brown received all of the benefit from these profitable publications. The Transfers ultimately generated cash to Brown, preserved and enhanced the value of Brown's assets, and increased its ultimate sale price. If the Transfers could be avoided as constructively fraudulent, then any transfer made by an allegedly insolvent parent on behalf of a subsidiary (which was itself insolvent only because of the parent's insolvency) could be avoided. This would discourage vendors and businesses from

working with corporate groups that utilize integrated cash management systems, especially if the parent was at or near insolvency. Brown and Utah operated as a single economic unit, and the Court will not disregard the value of the services Hudson provided that benefited Brown merely because Brown and Utah were separate, insolvent entities.

### Remaining Causes of Action: §549, §550, §502, Setoff and Recoupment

The Trust pled a third cause of action to recover post-petition transfers pursuant to §549. However, the Trust has not alleged that any of these Transfers took place post-petition. No facts on the record support a conclusion that an avoidable transfer occurred post-petition. Because no transfer is avoidable, §550 does not apply. Similarly, the Trust's Fifth Cause of Action to disallow Hudson's claim against the Debtor pursuant to §502(d) and (j) shall be dismissed. Pursuant to §502(d), claims of the Defendant against Debtor must be disallowed until they pay to the Trust the aggregate amount of avoidable transfers. None of the transfers are avoidable, so §502(d) does not apply. Pursuant to §502(j), a claim that has been allowed or disallowed may be reconsidered for cause. Because none of the Transfers are avoidable, and the Trust has advanced no other "cause" that might support reconsideration, §502(j) does not apply. The Trust's Sixth Cause of Action is for Setoff and Recoupment, which would allow the Debtor to offset a debt owing to Defendant by an amount equal to a debt owing by Defendant to the Debtor. The Defendant does not owe anything to the Debtor because none of these Transfers are avoidable. Thus, setoff and recoupment do not apply.

### Conclusion

For all of the foregoing reasons, the Court finds that the Transfers are not subject to avoidance pursuant to §§547, 548, or 549 of the Bankruptcy Code. The Court further finds that the Transfers may not be recovered from Defendant pursuant to §550, and Defendant's claims

will not be disallowed pursuant to §502 or general principles of setoff and recoupment.

Judgment will be entered in favor of the Defendant dismissing the Complaint in its entirety.

Dated:  Central Islip, New York
         April 3, 2014                              By: **Robert E. Grossman**
                                                        Robert E. Grossman,
                                                         United States Bankruptcy Judge